IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LAURA LEE BERNSTEIN, | : | CIVIL ACTION NO. |
| | : | 1:11-CV-3989-WSD-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGIA DEPARTMENT OF | : | **FINAL REPORT AND** |
| EDUCATION ET AL., | : | **RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

Plaintiff Laura Lee Bernstein filed the above-styled civil action on November 18, 2011 [1]. Plaintiff alleges that Defendants discriminated against her on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, by terminating her employment. The case is now before the Court on Defendants' Motion for Summary Judgment [34]. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [34] be **GRANTED**.

## I.    BACKGROUND FACTS

Unless otherwise noted, the undersigned draws the following undisputed material facts from Defendants' Statement of Material Facts [34-2]. Plaintiff failed to file a response to the numbered facts Defendants presented, as Local Rule 56.1

requires. *See* LR 56.1(B)(2), NDGa. Because Plaintiff failed to controvert any of Defendants' facts in a procedurally-correct manner, the Court must accept those facts as admitted. *See* LR 56.1(B)(2)(a)(2), NDGa. Plaintiff did, however, file a separate Statement of Undisputed Material Facts [42], to which Defendants filed a Response [44]. The undersigned considers the material facts from Plaintiff's submission [42] in adjudicating Defendant's Motion, including the statements in Plaintiff's affidavit [42-2].

The Court has excluded all assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not in the statement of facts. *See* LR 56.1B(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as applicable law requires on a defendant's motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v.*

*Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993). Accordingly, the undersigned views the following facts in the light most favorable to Plaintiff:

Plaintiff, a Caucasian female, was hired by the Georgia Department of Education (the "Department") in October 2005 as a Resource Specialist in the Migrant Education Program ("MEP"); Defendant Craig Geers, then Program Manager for the MEP, hired Plaintiff. Def. SOMF [34-2] ¶ 1; Pl. SOMF [42] ¶¶ 5-6. The Department oversees public education, kindergarten through twelfth grade in the State of Georgia and ensures that the laws and regulations pertaining to education are followed, and that state and federal money is properly allocated in Georgia school systems. Def. SOMF [34-2] ¶ 3. The Department administers the MEP, a Title I federally-funded program designed to support comprehensive educational programs for migrant children. Def. SOMF [34-2] ¶ 4. Defendant Geers, a Caucasian male, was promoted to Director of Outreach Programs in May of 2009, supervising four federal outreach programs, including the MEP. Def. SOMF [34-2] ¶ 5.

Plaintiff served as a Resource Specialist until July 2007 when she applied for, and was hired as, State Comprehensive Needs Assessment Coordinator for the MEP. Pl. SOMF [42] ¶ 7. Defendant Geers was one of the people who interviewed Plaintiff

for that position. *Id.* On August 1, 2009, Geers promoted Plaintiff to Program Manager, a position that came with a pay increase and supervisory responsibility over approximately 38 employees. Def. SOMF [34-2] ¶ 2; Pl. SOMF [42] ¶ 9. Except for the Division Directors, the position was the highest level before Assistant Superintendent. Def. SOMF [34-2] ¶ 2. Plaintiff held that position until she was terminated. Pl. SOMF [42] ¶ 11. Plaintiff never heard any disparaging comments based on her race and never heard any comments that she perceived as racially discriminatory while employed at the Department. Def. SOMF [34-2] ¶ 45.

Defendant Erin Elmore, a Caucasian female, has been the Director of Human Resources at the Department since 2003. Def. SOMF [34-2] ¶ 6. Her job duties include overseeing hiring, terminations, performance evaluations, payroll, and benefits. *Id.*

Defendant Dr. Barbara Lunsford, Caucasian female, has been the Associate Superintendent for School Improvement at the Department since November 2008. Def. SOMF [34-2] ¶ 7. Her job duties include overseeing and supervising the division of school improvement and various federal programs including the MEP. *Id.*

Defendant Kathy Cox, Caucasian, was the former State School Superintendent until June 30, 2010. Def. SOMF [34-2] ¶ 8. Her involvement in Plaintiff's termination was limited to approving the termination recommendation and presenting the recommendation to the State Board of Education. *Id.* Plaintiff did not serve Cox with this lawsuit, nor did Plaintiff request that Cox waive service. Def. SOMF [34-2] ¶ 9.

Defendant Dr. Diane Bradford, a Caucasian, was the Deputy Superintendent for Education Support and Improvement until November 30, 2010. Def. SOMF [34-2] ¶ 10. Plaintiff did not serve Bradford with this lawsuit, nor did Plaintiff request that Bradford waive service. Def. SOMF [34-2] ¶ 11.

Defendants Helen Odom Rice, Daniel Israel, Kenneth Mason, Barbara Hampton, Mike Royal, and J. Grant Lewis did not play any role in Plaintiff's termination because they did not become members of the Georgia State Board of Education until January 2011, after Plaintiff was terminated. Def. SOMF [34-2] ¶ 12.

Defendant Dr. John C. Barge, the State School Superintendent, did not have any role in Plaintiff's termination because he did not take office until January 10, 2011, after Plaintiff was terminated. Def. SOMF [34-2] ¶ 13.

Defendants Linda M. Zechmann, Caucasian; Elizabeth J. Ragsdale, Caucasian; Wanda Barrs, Caucasian; Larry E. Winter, Caucasian; Brian K. Burdette, Caucasian; Allen C. Rice, Caucasian; and Mary Sue Murray, Caucasian, are members of the Georgia State Board of Education. Def. SOMF [34-2] ¶ 14. Their involvement in Plaintiff's termination was limited to their vote to approve the decision to terminate Plaintiff. *Id.*

By Executive Order, the Governor of Georgia has established a Code of Ethics for Executive Branch officers and employees that states in relevant part:

> Section 3. Conflicts of Interest
>
> 1.  An employee of the Executive Branch of the State shall make every effort to avoid even the appearance of a conflict of interest. An appearance of conflict exists when a reasonable person would conclude from the circumstances that the employee's ability to protect the public interest, or perform public duties is compromised by personal interests. An appearance of conflict could exist even in the absence of a true conflict of interest.

Def. SOMF [34-2] ¶ 15.

On December 1, 2005, Plaintiff signed an acknowledgment that she had received and reviewed the Executive Order establishing a Code of Ethics for Executive Branch Officers and Employees. Def. SOMF [34-2] ¶ 16. On July 30, 2008

6

and June 29, 2009, Plaintiff signed acknowledgments that she had received, reviewed, and agreed to abide by the (1) Employee Code of Ethics/Governor's Executive Order on Ethics, (2) the Code of Ethics for Government Service, (3) the Department's Gifts and Favors Policy and (4) O.C.G.A. §§ 45-10-20 to 45-10-28 (Georgia's conflict of interest laws), and that she was unaware of any violations of these requirements. Def. SOMF [34-2] ¶ 17; *see also* Pl. SOMF [42] ¶ 15.

Plaintiff on May 13, 2004 filed Articles of Incorporation for Habersham Immigration and Education Consulting Services, Inc. ("Habersham IECS"), an S-Corporation, listing herself as the incorporator. Def. SOMF [34-2] ¶ 18; Pl. SOMF [42] ¶¶ 2-3. In addition to Plaintiff, the company's other shareholders included Gavin Bernstein, Tim Buchanan and Thomas Webb. *Id.* Tim Buchanan at one point became a Department employee in the MEP. Def. SOMF [34-2] ¶ 19.

Plaintiff created Habersham IECS to offer services to anyone who needed help with immigration paperwork and to assist colleges and universities in establishing their own international offices. Def. SOMF [34-2] ¶ 20; *see also* Pl. SOMF [42] ¶ 2. Plaintiff's job with the company was to provide the services specified. Pl. SOMF [42] ¶ 4. After Plaintiff began working for the Department, she continued to hold the

7

position of CEO of the Habersham IECS and to hold shareholder meetings. Def. SOMF [34-2] ¶ 25.

In 2005, 2006, 2007, 2008, 2009 and 2010, Plaintiff renewed the annual registration of Habersham IECS with the Georgia Secretary of State's office, listing herself as Chief Executive Officer ("CEO") and registered agent, and listing her home address as the company's address. Def. SOMF [34-2] ¶ 24. Thus, during the entire period of Plaintiff's employment with the Department, Habersham IECS was a valid corporation and Plaintiff annually renewed the corporation's registration with the Georgia Secretary of State. Pl. SOMF [42] ¶ 12.

Habersham IECS maintained a website that advertised the services the company offered. Def. SOMF [34-2] ¶ 21. The website listed Plaintiff's personal email address and home address for company contact information. Def. SOMF [34-2] ¶ 22. In May 2010, the website was still up and listed June 23, 2007 as the date of its last modification. Def. SOMF [34-2] ¶ 23.

In May 2010, Defendant Lunsford contacted Habersham County in response to a complaint from the County's school system that Plaintiff had threatened the school system with action against their migrant program when it refused to register

her child for pre-kindergarten. Def. SOMF [34-2] ¶ 26. Defendant Lunsford and Defendant Geers met with Plaintiff to discuss the incident and to request that she write a letter of apology, but Plaintiff denied the allegations. Def. SOMF [34-2] ¶ 27; *see also* Pl. SOMF [42] ¶ 24. Plaintiff in that meeting explained to Lunsford and Geers that the incident was a misunderstanding. Pl. SOMF [42] ¶ 25. None of the parties to the meeting were hostile or otherwise aggressive. *Id.* After that meeting, however, Defendant Lunsford overheard Plaintiff talking on the phone, describing the incident in a way that was more consistent with how Habersham County described it. Def. SOMF [34-2] ¶ 28. That sequence of events caused Defendant Lunsford to question whether she could trust Plaintiff. *Id.*

Also in May 2010, Christy Davis, a DOE Budget Analyst, brought the website for Habersham IECS to Defendant Geers' attention. Def. SOMF [34-2] ¶ 29. Defendant Geers reviewed the Georgia Secretary of State's records for Habersham IECS and discovered that the company was active and had been renewed every year through the current year, and that Plaintiff was listed as its Chief Executive Officer and Tim Buchanan was listed as its Chief Financial Officer. Def. SOMF [34-2] ¶ 30.

Geers was concerned that Plaintiff's involvement with Habersham IECS might be a conflict of interest with her DOE employment because the services listed on the company's website appeared to Geers to serve the same population as the MEP. Def. SOMF [34-2] ¶ 31. Geers relayed the information he found about Habersham IECS' website to Defendant Lunsford, his supervisor, and to Defendant Elmore. Def. SOMF [34-2] ¶ 32.

Elmore recommended that Lunsford and Bradford meet with Plaintiff while Geers and another DOE Program Manager meet with Tim Buchanan. Def. SOMF [34-2] ¶ 33. Elmore further recommended that Plaintiff and Tim Buchanan be placed on paid administrative leave during the investigation because they were friends outside of work; because Tim Buchanan reported to Plaintiff; and because Plaintiff and Buchanan were managers and Elmore wanted to limit the disruption to the MEP while the potential conflict of interest was reviewed. Def. SOMF [34-2] ¶ 34. Elmore does not consider paid administrative leave to be punitive; she decides whether to use such leave on a case-by-case basis. Def. SOMF [34-2] ¶ 35.

During Plaintiff's meeting with Lunsford and Bradford, Plaintiff told Lunsford and Bradford that Habersham IECS was an S-Corporation, that she was the CEO, that

she did not do any work for it, but that it was kept active for tax purposes. Def. SOMF [34-2] ¶ 36; *see also* Pl. SOMF [42] ¶ 26.

Following the meeting, Plaintiff was placed on administrative leave pending an investigation into the potential conflict of interest. Pl. SOMF [42] ¶ 27. Plaintiff was escorted to her cubicle, surrendered her blackberry and laptop and was escorted out of her building. *Id*. Plaintiff was told not to discuss the matter with anyone and that someone from the Department would get in touch with her. Pl. SOMF [42] ¶ 28.

Lunsford and Geers contacted Plaintiff that afternoon regarding the active status of Habersham IECS. Pl. SOMF [42] ¶ 29.[1] Plaintiff was told that Department staff would discuss the matter further and that Plaintiff would be contacted at a later date. Pl. SOMF [42] ¶ 30.

The following week, Plaintiff met with Elmore, Lunsford and Geers to further discuss her involvement in Habersham IECS. Def. SOMF [34-2] ¶ 37; *see also* Pl. SOMF [42] ¶ 31-32. Plaintiff informed them that Habersham IECS had not generated any income and that she did not think her involvement with the company was a

---

[1] There are two paragraphs numbered "29." *See* Pl. SOMF [42] at 8. This citation refers to the first of those two paragraphs.

conflict of interest. *Id*. Plaintiff offered to resign as President of Habersham IECS. Pl. SOMF [42] ¶ 32.

During this second meeting, Elmore was disappointed in what she perceived to be Plaintiff's hostile and unprofessional behavior, and in Plaintiff's position that her involvement with the corporation could not be perceived as a conflict of interest. Def. SOMF [34-2] ¶ 38. Plaintiff describes herself as being "emotional" during the meeting and "willing to do whatever was necessary to eliminate any perceived conflict of interest." Pl. SOMF [42] ¶ 33. Plaintiff was told she would be contacted after the matter had been discussed further. Pl. SOMF [42] ¶ 34.

During the second meeting, Geers perceived Plaintiff's behavior to be hostile and insubordinate towards him, in part because Plaintiff pointed at Geers and referred antagonistically to Geers in the third person, as "he" and "him," even though he was present in the room. Def. SOMF [34-2] ¶ 40. Defendant Lunsford also perceived Plaintiff's behavior during the meeting to be loud, adversarial, troubling and antagonistic toward her supervisors, as well as inappropriate for someone in a leadership position. Def. SOMF [34-2] ¶ 41.

Between the two meetings, Defendants Elmore, Lunsford and Geers discovered that another person had signed Plaintiff's new hire salary verification letter from Habersham IECS as Chief Financial Officer ("CFO"), even though Tim Buchanan was listed as the company's CFO with the Secretary of State. Def. SOMF [34-2] ¶ 39.

After the second meeting, Elmore, Lunsford and Geers decided to recommend that Plaintiff be terminated because they felt they could no longer trust Plaintiff to manage a large program in light of what they perceived as Plaintiff's hostile and insubordinate behavior at the meeting, as well as what they felt were inconsistent responses regarding Habersham IECS. Def. SOMF [34-2] ¶ 42. The recommendation to terminate Plaintiff was put before the State Board of Education; the Board voted to approve the termination. Def. SOMF [34-2] ¶ 43. Following Plaintiff's termination, the Department hired John Wight, a Caucasian male, to fill the MEP Program Manager position. Def. SOMF [34-2] ¶ 44.

Plaintiff argues that Norma Nunez-Cortez, a Hispanic female, was treated differently than was Plaintiff after Nunez-Cortez was accused of having a conflict of interest with her Department employment. Def. SOMF [34-2] ¶ 46; *see also* Pl. Affidavit [42-2] ¶ 21A. Ms. Nunez-Cortez was an Adolescent Outreach Specialist in

the MEP, a position below Plaintiff's with no supervisory responsibility in the MEP. Def. SOMF [34-2] ¶ 47.

In March 2008, Defendant Geers discovered that Ms. Nunez-Cortez was listed as an owner of a private business on the Secretary of State's website which was housed in the same building as her Department office. Def. SOMF [34-2] ¶ 48. (Nunez-Cortez was an officer in three separate businesses that her husband operated that employed migrant workers. Pl. SOMF [42] ¶ 40.)

Together with Nunez-Cortez's supervisor, Defendant Geers questioned Nunez-Cortez about her ownership of the business. Def. SOMF [34-2] ¶ 49. After Defendant Geers reported what he found to Human Resources, and before he could get back to Nunez-Cortez, Nunez-Cortez removed herself from the company and started looking for a new location for her office. Def. SOMF [34-2] ¶ 50; *see also* Pl. SOMF [42] ¶ 41. From Defendant Geers' perspective, Ms. Nunez-Cortez never displayed any unprofessional behavior during their interaction. Def. SOMF [34-2] ¶ 51. Nunez-Cortez was never placed on administrative leave. Pl. SOMF [42] ¶ 42.

Plaintiff argues that Mireya Jackson, another Department employee, was also treated differently than Plaintiff after Jackson was accused of having a conflict of

14

interest with her Department employment. Def. SOMF [34-2] ¶ 52; *see also* Pl. Aff. [42-2] ¶ 21B. Jackson was a Recruiter in the MEP, a position two levels below Program Manager. Def. SOMF [34-2] ¶ 53. Jackson did not supervise anyone and was paid the lowest salary. *Id*. Jackson identified herself on her State of Georgia State Security Questionnaire as Caucasian. Def. SOMF [34-2] ¶ 54.

In 2007, Defendant Geers received an anonymous tip that Jackson was a real estate agent at Century 21. Def. SOMF [34-2] ¶ 55. Geers relayed the tip to his supervisor and to Defendant Elmore. *Id*. Jackson was a licensed real estate agent and sold real estate during the period of her employment with the Department. Pl. SOMF [42] ¶ 43.

Defendant Geers and Jackson's supervisor questioned Jackson about her second job; from Defendant Geers' perspective, Ms. Jackson reacted professionally and cooperatively, providing them with a letter confirming her agreement to no longer sell real estate. Def. SOMF [34-2] ¶ 56; *see also* Pl. SOMF [42] ¶ 44.

In June 2010, Mr. Jose Israel Cortez, Jackson's supervisor, received an anonymous tip that Ms. Jackson was selling real estate again through another company. Def. SOMF [34-2] ¶ 57. Cortez reported the tip to Defendant Geers.

15

Between the 2007 incident and June 2010, Geers was unaware that Jackson had returned to selling real estate. Def. SOMF [34-2] ¶ 58.

In June 2010, Defendant Elmore placed Ms. Jackson on administrative leave because she had returned to selling real estate despite receiving a prior warning; this sequence of events created a trust issue. Def. SOMF [34-2] ¶ 59; *see also* Pl. SOMF [42] 45. Ms. Jackson was terminated effective July 12, 2010. Def. SOMF [34-2] ¶ 60; *see also* Pl. SOMF [42] ¶ 45.

Plaintiff claims that Jesus Mercado, another Department employee, was treated differently than she was after Mercado was accused of having a conflict of interest with his Department employment. Def. SOMF [34-2] ¶ 61 and Pl. Aff. [42-2] ¶ 21D. Mercado was a Recruiter in the MEP program, a position that two levels below Program Manager. Def. SOMF [34-2] ¶ 62. Mercado did not supervise anyone and was paid the lowest salary. *Id*.

In 2010, Geers received a letter from the mother of Mercado's child enclosing Department documents containing personal contact information for migrant-eligible participants, which she allegedly received from Mercado to use in selling cosmetics. Def. SOMF [34-2] ¶ 63. When Geers confronted Mercado with this allegation,

Mercado was respectful and cooperative, but denied the allegations and claimed that the individual must have stolen them from his home office. Def. SOMF [34-2] ¶ 64. Because Mercado denied the allegations, and because it was his word against that of the mother of his child, a written reprimand was placed in Mercado's personnel file, but no other action was taken. Def. SOMF [34-2] ¶ 65. Mercado is still employed by the Department. Pl. SOMF [42] ¶ 49.

## II.  DISCUSSION

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court

must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). The court instead simply determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See Anderson*, 477 U.S. at 248. Disputed facts that do not resolve

or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable"[2] or is "not significantly probative." *See id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or

---

[2] "Colorable" is defined as "appearing to be true, valid or right." BLACK'S LAW DICTIONARY 259 (7th ed. 2004).

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

### B.   PLAINTIFF'S CLAIMS AGAINST DEFENDANTS BRADFORD AND COX

Defendants begin by arguing that Plaintiff has not perfected service of process on Defendants Bradford and Cox. *See* Def. Brf. [34-1] at 4-5. Defendants write that "[i]n response to service upon the other Defendants, . . . Bradford and Cox, appearing specially and without consenting to the jurisdiction of the Court, filed an Answer and Defenses on May14, 2012." *Id.* at 4. Bradford and Cox specifically designated themselves as making "special appearance[s]" in Defendants' Answer [4]. Answer [4] at 1-2. Defendants also rely on their Sixteenth Affirmative Defense that "Plaintiff's claims are barred to the extent that she has not perfected service of process on all of the named Defendants" to support this argument. *Id*. at 5. Defendants' approach is sufficient given that "it is no longer is necessary to appear specially or to employ any particular set of words to challenge . . . service of process." 5B Wright & Miller, Federal Practice and Procedure § 1344 (3d ed.).

A party may seek dismissal under Rule 12 for insufficient service of process. *See* Fed. R. Civ. P. 12(b)(5). Such motions challenge "the mode of delivery or lack of delivery of the summons and complaint." 5B Wright & Miller, Federal Practice and Procedure § 1353 (3d ed.).

Federal Rule of Civil Procedure 4 requires a plaintiff to serve the defendant within 120 days of the filing of the complaint, and to file proof of service with the Court. *See* Fed. R. Civ. P. 4(c), (*l*), (m). While Plaintiff filed waivers of service [3] for Defendants Barge, Burdette, Lewis, Rice, Murray, Geers, Lunsford and Elmore, the Docket contains no such waivers for Defendants Bradford or Cox. Moreover, the Docket shows no other proof of service document for Defendants Bradford or Cox. Indeed, Plaintiff admits that she never served Cox or Bradford with process. *See* Def. SOMF [34-2] ¶¶ 9, 11.

This action began on November 18, 2011. *See* Complaint [1]. The 120 day period for service therefore expired more than one year ago. Plaintiff, moreover, has never requested additional time to serve Defendants Cox and Bradford. In addition, Plaintiff failed to address this portion of Defendant's argument in her Response [42-1]. Defendant's Motion [34] is therefore unopposed to the extent Defendant seeks

summary judgment in favor of Defendants Cox and Bradford for lack of service. Plaintiff's silence is dispositive as to this argument. *See* LR 7.1B (failure to file a response to a motion "shall indicate that there is no opposition to the motion"); *see also Tucker v. City of Florence, Ala.*, 765 F. Supp. 2d 1320, 1333 (N.D. Ala. 2011) (summary judgment due to be granted on Plaintiff's abuse of process claims because Plaintiff "marshaled no argument whatsoever to counter defendants' assertion" in that regard); *Welch v. Delta Airlines, Inc.*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (granting summary judgment on Title VII hostile work environment claim where Plaintiff's response brief failed to address Defendant's statute of limitations argument); *cf. Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) (if party opposing motion to dismiss files a responsive memorandum, but fails to address arguments the movant makes, court may treat those arguments as conceded, even where result is dismissal of the entire case). The undersigned therefore **RECOMMENDS** that Defendant's Motion [34] be **GRANTED** with respect to Plaintiff's claims against Defendants Cox and Bradford.

22

C.    PLAINTIFF'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Defendants also argue that the Court should grant summary judgment in favor of all of the individual Defendants because Title VII does not allow for individual liability. *See* Def. Brf. [34-1] at 5-6. Plaintiff fails to address this argument in her Response [42-1] as well.

The Eleventh Circuit has held that "relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act . . ." *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006); *see also Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). Plaintiff may therefore only assert her claims against her actual employer, namely, the Georgia Department of Education. Moreover, for the reasons explained above, Plaintiff's failure to address this argument constitutes her concession thereto. The undersigned therefore **RECOMMENDS** that Defendants' Motion [34] be **GRANTED** with respect to Plaintiff's claims against Defendants Zechman, Ragsdale, Rice, Israel, Mason, Hampton, Royal, Barrs, Winter, Burdette, Lewis, Rice, Murray, Barge, Cox, Geers, Lunsford, Bradford and Elmore.

D.     PLAINTIFF'S TITLE VII CLAIM

1.     Standards of Proof under Title VII

Plaintiff alleges her termination resulted from race-based discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). A plaintiff may establish discriminatory intent by direct evidence or by circumstantial evidence meeting the four-pronged test for Title VII cases set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984).

24

Direct evidence is evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). It "relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998). Only the most blatant remarks which display a clear intent to discriminate constitute direct evidence. *See Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. In contrast, evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence.

Because direct evidence of discrimination is seldom available, plaintiffs instead typically rely on circumstantial evidence to prove discriminatory intent using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),

25

and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield*, 115 F.3d at 1561-62; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Circumstantial evidence is evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). Under this framework, a plaintiff must create an inference of discriminatory intent, and thereby carries the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *See Jones*, 137 F.3d at 1310-1311; *Holifield*, 115 F.3d at 1562; *Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*,

26

450 U.S. at 253-54; *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff survives a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *See Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

The *McDonnell Douglas-Burdine* proof structure, however, "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged

disparate treatment, but is only a tool. *See Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* at 1184 (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *See Burdine*, 450 U.S. at 253.

2.     Plaintiff's Prima Facie Case

Plaintiff does not argue that she has produced direct evidence of Defendants' discriminatory intent. Her discrimination claim therefore rests on circumstantial evidence. The Court, by extension, analyzes the record under the *McDonnell Douglas-Burdine* framework. Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: 1) she is a member of a protected class;[3] 2) she was subjected to an adverse

---

[3] Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," individuals of any sex, race, or religion may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (*citing McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976)). Thus, because every individual is a member of a "protected class,"

employment action by her employer; 3) she was qualified to do the job in question, and 4) her employer treated similarly-situated employees outside her protected classification (*i.e.*, those of a different sex or race) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield*, 115 F.3d at 1562.

Defendant concedes that Plaintiff fulfills the first three elements of this framework. *See* Def. Brf. [34-1] at 8. The issue, then, is whether Plaintiff can produce evidence of similarly-situated individuals outside her protected class (Caucasian) whom Defendant treated better than Plaintiff.

"When evaluating an allegation of disparate treatment," courts "require that a comparator be similarly-situated to the plaintiff in all relevant respects." *Stone & Webster Constr. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (internal quotations and citation omitted). Indeed, the comparator employee "must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th

---

the key element of a plaintiff's *prima facie* case is establishing that the employer treated persons outside of the plaintiff's protected classification (*i.e.*, those of a different race, sex, or religion) more favorably than the plaintiff. *See Wright*, 187 F.3d at 1290 n.3.

Cir. 2004). "The quantity and quality of the comparator's misconduct must be nearly identical" to that of the plaintiff. *Brown*, 401 F. App'x at 480 (internal quotations and citation omitted). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (internal quotations and citation omitted).

Federal courts carefully examine proffered comparators to ensure that any comparison is not "confusing apples with oranges." *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). *See, e.g., Greer v. Birmingham Beverage Co., Inc.*, 291 F. App'x 943, 946 (11th Cir. 2008) (finding that Plaintiff failed to identify similarly-situated individuals; coworkers Plaintiff identified were disciplined once for excessive cell phone usage, while Plaintiff was disciplined twice); *Roy v. Broward Sheriff's Office*, 160 F. App'x 873, 876 (11th Cir. 2005) (finding plaintiff, a terminated deputy sheriff, did not identify any similarly-situated individuals; closest potential comparator was not in uniform and riding in a private vehicle at time of incident in question, while plaintiff was in uniform and driving a police car at time of incident leading to termination). Courts consider whether the proffered comparator had the same supervisor, *see Morris v. Potter*, 251 F. App'x 667, 668-669 (11th Cir.

2007), as well as the type of position the plaintiff holds and the content of the plaintiff's work, *see Simionescu v. Bd. of Tr. of the Univ. of Alabama*, 482 F. App'x 428, 430-431 (11th Cir. 2012) (finding that two university faculty members were not similarly-situated because one was not tenure-track, while plaintiff was, and second faculty member taught in a different department than did plaintiff). "Material differences in ranks and responsibilities are [also] relevant . . . [in] considering whether an employee is a proper comparator." *Cyprian v. Auburn Univ. Montgomery et al.*, 799 F. Supp. 2d 1262, 1282 (M.D. Ala. 2011) (citing *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008)); *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011) (differences in rank "are not, in and of themselves, dispositive as to whether . . . two individuals may be compared . . . but they can matter. . . . If the same policies were applied differently to similarly-ranked employees, those employees may be compared."); *Gibbons v. Auburn Univ. at Montgomery et al.*, 108 F. Supp. 2d 1311, 1318 (M.D. Ala. 2000) (white university professor was similarly-situated to black professor claiming Title VII violation in part because both professors were same rank).

There are substantial distinctions between the Plaintiff's situation and those of the proffered comparators. Three of the comparators, Norma Nunez-Cortez, Jesus

Mercado, and Mireya Jackson, were non-managerial employees of lower rank than Plaintiff, and who did not supervise any other Department employees. Def. SOMF[34-2] ¶¶ 47, 53, 62. This distinction is important, especially where Defendant's witnesses explain that their decision was based in part on their lack of trust in Plaintiff maintaining her managerial position. Def. SOMF[34-2] ¶ 42. A manager is typically vested with more discretion and is subject to less immediate supervision, and is in more of a position of trust. An employer may also harbor a greater faith that its managers know and will follow the rules and will avoid even questionable conduct so as to set the appropriate example. It follows that a manager's conduct violating the employer's trust or demonstrating poor leadership qualities may raise more concerns and may be more harshly disciplined than if non-managerial staff display the same conduct. Defendant puts great emphasis on Plaintiff's managerial position in explaining why she was treated the way she was. *See* Def. Brf. [34-1] at 14. Plaintiff would be hard-pressed to show that race was the true reason for her adverse treatment if the only comparisons were to non-managerial employees who did not occupy positions of trust in the organization.

However, Plaintiff's March 2013 Affidavit [42-2] identifies one fellow manager, Israel Cortez, who allegedly engaged in outside charitable activities

32

marketed towards the migrant community, but who remains employed with the Department of Education. *See* Pl. Aff. [42-2] ¶ 21(C). Defendant Geers in his affidavit states that he was unaware that Cortez actively raised funds or otherwise worked for the charities. Geers Aff. [34-6] ¶ 24. Geers admits, however, that he was aware of the charities and Cortez's connection to them, and that one of them is actually named the "Israel Cortez Foundation." Geers Dep. [34-37] at 124-126. According to Geers, this was acceptable, because Cortez informed Geers of this outside activity. *See id.* Although Defendants may dispute it at trial, Plaintiff in her affidavit claims that she also informed Geers of the facts regarding her company in 2006. Pl. Aff. [42-2] ¶ 8.

One may ponder whether Cortez's charitable foundations, which apparently raise funds to benefit the migrant community, raise the same potential conflicts as a commercial operation aimed at providing fee-based services to the migrant community. But Geers admits that Cortez's activities would at least be a "potential" violation, were it not for Cortez's disclosure to the Department of what he was doing, which, as noted above, Plaintiff says she made, too. Geers Dep. [34-37] at 125-126. The Court, reading the facts in the light most favorable to the Plaintiff, and mindful that Plaintiff's burden to show a *prima facie* case is not onerous, assumes that Israel

Cortez is a valid comparator for purposes of responding to Defendant's Motion [34]. The effect of this approach is to shift the burden to Defendant to demonstrate that race was not the reason for Plaintiff's termination. As explained below, Defendant succeeds in doing so, and therefore summary judgment is warranted.

### 3.     Defendant's Legitimate Non-Discriminatory Reason

Even if Plaintiff establishes a *prima facie* case, summary judgment for Defendants is still warranted if Defendants establish that Plaintiff's termination was motivated by legitimate, non-discriminatory reasons. Defendants state that they terminated Plaintiff because of the their lack of trust in Plaintiff based on the results of, and Plaintiff's reaction to, the investigation into Habersham IECS. *See* Pl. Brf. [34-1] at 15-16. The perception of Geers and others that Plaintiff displayed a hostile, antagonistic and insubordinate response to their investigation was a major reason why they claim they lost trust in Plaintiff. *See* Def. Brf. [34-1] at 15; Def. SOMF [34-2] ¶¶ 38; 40-42. Defendants also point to discrepancies they found in Plaintiff's account of her contact with the Habersham County Pre-K program and discrepancies related to the person listed as Habersham IECS' Chief Financial Officer. *See* Def. SOMF [34-2] ¶¶ 28; 39. While these reasons arise from Defendants' investigation into a potential

violation of conflict of interest policies by Plaintiff, Defendants do not state that Plaintiff was terminated specifically for conflict of interest violations in and of themselves. *See* Def. Reply [43] at 11-12.

Based on this record, Defendants' stated rationales qualify as legitimate, non-discriminatory reasons to terminate Plaintiff, particularly given Plaintiff's leadership position and her supervisory authority over 38 employees. The burden thus shifts back to Plaintiff as discussed below.

### 4.    Pretext

Even if an employer points to a legitimate, non-discriminatory reason for an adverse employment action, the Court must still deny the employer's summary judgment motion if Plaintiff produces evidence that the ostensibly legitimate reason is merely a pretext for unlawful discrimination. A plaintiff may meet her burden of showing that her employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not

believable. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). The plaintiff, in other words, has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *See Burdine*, 450 U.S. at 256; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830.

Plaintiff fails to point to sufficiently probative evidence to rebut Defendants' termination rationale. Plaintiff does not even respond to, and therefore is deemed to

admit, Defendants' undisputed facts asserting, among other things, that Defendant Geers was concerned with the potential conflict created by Habersham IECS, Def. SOMF [34-2] ¶ 31; that Defendants Elmore, Geers and Lunsford perceived Plaintiff's behavior in response to being questioned about Habersham IECS as "hostile," "unprofessional," "loud," "adversarial," "troubling," "antagonistic," and "not appropriate for someone in a leadership position," *Id.* at ¶¶ 38, 39, 41; that, as a specific example, Geers perceived Plaintiff to be "hostile and insubordinate to him," by pointing to him and referring to him in the third person as "him" and "he," even though he was present in the room, *id.* at ¶ 40; and ultimately that "Elmore, Lunsford and Geers decided to recommend Plaintiff's termination because they felt they could no longer trust Plaintiff to manage a large program in light of what they perceived to be hostile and insubordinate behavior at the meeting and what they felt were inconsistent responses regarding the Habersham IECS." *Id.* at ¶ 42.

Despite admitting these facts, Plaintiff in her affidavit states that she was not actually "hostile or unprofessional" in her meetings with Geers, Lunsford and Elmore, although she acknowledges that she was "emotional." Pl. Aff. [42-2] ¶ 18. But the issue here is not whether Plaintiff was actually "hostile or unprofessional" or whether Geers, Lunsford and Elmore were wrong in believing that she was. The issue, rather,

is whether these decision makers actually perceived Plaintiff to have acted in these ways, correctly or not, and whether they decided to terminate her as a result. *See Holifield*, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."). Here, Plaintiff does not respond to, and therefore admits, Defendants' undisputed facts on these points. Her statement that, in her own opinion, she was merely "emotional" but not "unprofessional" does not create a material issue of fact.

For the same reasons, any dispute as to whether Plaintiff previously informed Geers about Habersham IECS and whether Plaintiff as a result believed that her involvement with Habersham IECS had been approved, *see* Pl. Aff. [42-2] ¶ 8, also does not preclude summary judgment. Similarly beside the point is whether Plaintiff's involvement with Habersham IECS was actually a policy violation, *see* Pl. Resp. [42-1] at 16-18. The question is instead whether Defendants perceived Plaintiff's reaction to being questioned about Habersham IECS to be inappropriate and whether that was the reason she was fired, and not race. Plaintiff simply does not properly dispute Defendants' facts on these points.

Plaintiff, moreover, fails to address other statements asserted by Defendants that directly relate to their decision to terminate her from her managerial position for untrustworthiness. Defendants state that they discovered a discrepancy regarding the person who signed Plaintiff's new hire salary verification letter from Habersham IECS as the company's supposed CFO, but who was not the official CFO per the company's public filings. Def. SOMF [34-2] ¶ 39. Plaintiff does not address this issue. Plaintiff also fails to rebut Defendants' statement regarding the discrepancies Defendants identified with regard to Plaintiff's interaction with the Habersham County Pre-K program. Def. SOMF [34-2] ¶ 28. That is, while Plaintiff provides her version of that incident, *see* Pl. Aff. [42-2] ¶¶ 9-10, she fails to rebut with competent evidence Defendant Lunsford's statement that she overheard Plaintiff provide a contradictory version of the incident in a phone conversation, Def. SOMF [34-2] ¶ 28.

To attempt to show pretext, Plaintiff again points to the "different treatment" applied to the Latino employees who engaged in arguable conflict-of-interest violations. Pl. Resp. [42-1] at 19. Plaintiff may, of course, point to the same disparate treatment evidence that she relied on in establishing a *prima facie* case. But, as noted

above, the standard is more onerous at the pretext stage, at which Plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young*, 840 F.2d at 829. Even assuming Plaintiff's comparator evidence satisfies her light burden to show a *prima facie* case, it does not create a triable issue of fact as to pretext.

For the same reasons discussed above, Plaintiff's comparisons are inapposite at least to the extent Plaintiff points to non-supervisory staff. More fundamentally, none of these incidents offer a useful comparison to the situation presented here. Defendants' undisputed facts – which Plaintiff fails to rebut – establish that they terminated Plaintiff not specifically for a conflict-of-interest violation, but more broadly "because they felt they could no longer trust Plaintiff to manage a large program in light of what they perceived to be hostile and insubordinate behavior at the meeting and what they felt were inconsistent responses regarding the Habersham IECS." Def. SOMF [34-2] ¶ 42. None of the incidents Plaintiff identified offer a meaningful comparison sufficient to show significantly probative evidence of pretext on this point.

Plaintiff suggests that Defendants have told her differing stories over time as to the reasons for her termination. *See* Pl. Brf. [42-1] at 20. She says that she was informed of her termination in an email from Defendant Elmore, which stated no substantive reason for termination but rather simply stated that her employment was "at-will." Pl. Dep. [38] at 71. Plaintiff states that she "found this interesting," because she had been "accused of one thing," and then once she was terminated the reason for termination was simply "at will." *Id.* Plaintiff then explains that, in the EEOC proceeding, Defendants provided "a whole different story" premised not on the conflict-of-interest *per se*, but rather on loss of faith in Plaintiff's ability to perform her managerial position. *Id.* at 78.

But Plaintiff never states that any Defendant ever told her she was terminated specifically for the conflict-of-interest. To the contrary, Plaintiff states that she first heard about her termination in an email from Elmore that simply stated "at will" for the reason. *See* Pl. Dep. [38] at 71. Stating that termination was based on "at will" employment, however, is not inconsistent with Defendant's later explanation about loss of trust. "At will" is not itself a substantive reason for termination, but simply a statement of an employee's legal status, that is, that the employee is subject to

termination at any time with or without cause. That Defendant here, once in legal proceedings, described for the first time a substantive reason why Plaintiff's "at will" employment was terminated does not show pretext.

Moreover, Plaintiff testified that Defendant's general practice is to not to supply substantive reasons for termination when firing program managers, but rather to simply say "at will" in the separation notice. *Id.* at 73. Plaintiff was treated consistently with this practice. This does not help Plaintiff support a claim that she was discriminated against.

Finally, Plaintiff's response brief states that "[t]he evidence shows that Geers has a long history of preferential treatment of Hispanics." Pl. Resp. [42-1] at 20. But Plaintiff fails to cite to any admissible evidence in that regard. First, she cites to her Complaint and her EEOC charge. *See id.* Those are mere allegations, and are at best hearsay. Second, she cites to a section of her deposition, *see* Pl. Dep. [38] at 126-133, in which Plaintiff lists a series of other Department of Education employees who Plaintiff believes also felt discriminated against. For example, Plaintiff refers to Susan Joyce-Stone, who according to Plaintiff "had expressed having an extremely difficult time being treated fairly as compared to the other state coordinators and believed it

42

was because of the fact that she was not Hispanic." *Id.* at 126. When asked if Plaintiff knew whether Ms. Joyce-Stone's belief was based on anything concrete, such as a demotion or denial of a promotion, Plaintiff stated "I can't answer that. I'm not positive on that, if that occurred." *Id.* at 126-127. As to another incident involving Judy Tench, part of the testimony Plaintiff cited in her reply brief [42-1] concerned facts that occurred at the Department of Education after she left. *See id.* at 130. These and other statements by Plaintiff – in which she simply relays statements and beliefs by other people as to discrimination they received – are not remotely admissible to prove the matter asserted. They are rank hearsay, lack foundation, and in many cases are based on blatant speculation. These statements do not assist in proving discrimination against Plaintiff here.

On this record then, Plaintiff fails to rebut Defendants' legitimate, non-discriminatory reasons for terminating her. Defendants are therefore entitled to summary judgment.

## III.   RECOMMENDATION

For all of the above reasons, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [34] be **GRANTED** and that judgment be entered in favor of Defendants.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 15th day of July, 2013.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE